IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| WESLEY BRIAN EARNEST, | ) | |
|     Petitioner, | ) | |
| | ) | Civil Action No. 7:18-cv-00595 |
| v. | ) | |
| | ) | |
| KEITH W. DAVIS, Warden, | ) | By:  Elizabeth K. Dillon |
| and | ) |       United States District Judge |
| HAROLD W. CLARKE, Director, | ) | |
|     Respondents. | ) | |

**MEMORANDUM OPINION**

Petitioner Wesley Brian Earnest, a Virginia inmate proceeding *pro se*, filed an original petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, and an amended petition, challenging his incarceration under an Amherst County Circuit Court criminal judgment entered February 10, 2011, for first-degree murder in violation of Virginia Code § 18.2-32 and use of a firearm in the commission of first-degree murder in violation of Virginia Code § 18.2-53.1 (Case Nos. CR 10013891-01 and CR 10013891-02).  The court sentenced Earnest to life in prison plus three years.  (Trial R. at 178-80.)[1]

Respondents filed a motion to dismiss the petition and amended petition as untimely, partially procedurally defaulted, and alternatively, without merit.  Earnest has responded, making the matter ripe for disposition.  After careful review of Earnest's claims and the entire record of all proceedings in the state court, the court concludes that Earnest's petition was filed past the statute of limitations.  Further, Earnest has failed to demonstrate that he is entitled to equitable

---

[1] Citations herein to "Trial R." refer to the records of the Amherst County Circuit Court in Earnest's criminal trial, using the page numbers in the lower right corner of each page.  Citations to "Habeas R." refer to the Amherst County Circuit Court habeas record, using the page numbers in the lower right corner of each page.

tolling or that he is "actually innocent." For these reasons, the court will grant the motion to dismiss and will deny Earnest a certificate of appealability.

I. BACKGROUND

On May 6, 2008, a Bedford County Circuit Court grand jury indicted Earnest for first-degree murder of his estranged wife, Jocelyn Earnest, on December 19, 2007, and for use of a firearm in the commission of that murder. Following a jury trial held March 24, 2010, through April 5, 2010, Earnest was convicted on both counts. Prior to the scheduled sentencing hearing, the court learned that several journals written by the victim and excluded from evidence had been inadvertently sent to the jury room with the trial exhibits. On July 26, 2010, the court entered a mistrial order, and the case was reset for November 8, 2010. On Earnest's motion for a transfer of venue due to heavy media coverage of the first trial, the court transferred venue to Amherst County Circuit Court for trial, with a venire panel to be selected from Nelson County. (Trial R. at 1–6.)

The trial took place from November 8, 2010, through November 19, 2010, during which the evidence, in the light most favorable to the government as the prevailing party, established that Ms. Earnest's body was found around noon on December 20, 2007, in her home in Forest, Virginia. She had died from a single gunshot wound to her head. A .357 handgun was lying near her right arm, and a typewritten note in the floor nearby appeared to be a suicide note. There were no signs of forced entry into the house, but the thermostat had been cranked up to 90 degrees, and the house was hot. Subsequent investigation of the crime scene and the autopsy were inconsistent with suicide.

Blood pattern analysis of the blood on the carpet indicated that Ms. Earnest's body was moved shortly after the shooting and had been drug through the first pool of blood. (Trial Tr. at

1222–47.) The angle of the bullet wound, from behind her right ear upward to the front of her head, just left of her left orbital, was an unusual angle for a self-inflicted wound. Further, Ms. Earnest had no blood spatter on her hands, and the stippling around the entrance wound had no soot, suggesting that the gun's barrel was at least two inches away from her head when fired, probably closer to two feet. (*Id.* at 1155–71.) Time of death could not be determined, other than to say that she had been dead more than 12 hours, because rigor mortis was dissipating by the time the medical examiner received the body for autopsy on the morning of December 21, 2007. The higher temperature in the house could also speed the process of rigor mortis, making an accurate time-of-death determination impossible. (*Id.* at 1195–99.)

Ms. Earnest's friend, Marcy Shepherd, with whom Ms. Earnest had been romantically involved, testified that she had been texting Ms. Earnest on December 19, discussing the possibility of getting together that evening after Ms. Earnest's counseling appointment. Her last text from Ms. Earnest was at 7:28 p.m. According to Wayne East, technician from the security company, Ms. Earnest's home security system was disarmed at 7:35 p.m., consistent with her normal practice; Ms. Earnest did not set the system at night, only when she was away from the house. (*Id.* at 942.) Shepherd thought that Ms. Earnest may have gone to dinner with a friend, but when she had not heard from Ms. Earnest after a couple of hours, she was worried and drove by Ms. Earnest's home around 9:45 p.m. Ms. Earnest's car was there, but no one answered the door, so Shepherd left. Upon learning that Ms. Earnest had not shown up at work by 10:00 a.m. the next morning, and still unable to reach her on the phone, Shepherd went back to Ms. Earnest's house on December 20, between 11:30 and noon. Ms. Earnest's car was in the same position as the previous evening. After calling Maysa Munsey, a mutual friend who had seen Ms. Earnest the previous day, Shepherd found the spare key to Ms. Earnest's home in the back

3

shed and entered the house. On finding the body, she told Munsey, and then both called the police. (*Id.* at 1027–34.) Based upon the text messages Ms. Earnest sent and when she turned off her security system, Ms. Earnest was clearly still alive at 7:35 p.m. By 9:45 or 9:50 p.m., when Shepherd came by and saw Ms. Earnest's car at home, but no one answering the door, Ms. Earnest may have been dead; that time frame, 7:35 to 9:50 p.m., is what the prosecutor called "the window" in which the murder occurred. (*Id.* at 2719.)

Earnest and his wife had been separated for more than two years, and Ms. Earnest had filed for divorce on grounds of desertion.[2] Earnest counter-sued for constructive desertion. According to Jennifer Stille, Ms. Earnest's divorce attorney, the divorce was contentious, particularly regarding financial matters and property. In addition to the marital residence, in which Ms. Earnest was living, the couple had built a home on Smith Mountain Lake, for which they had a $900,000 mortgage. Ms. Earnest, a manager at Genworth Financial, made more money than Earnest, who took a job as an assistant principal in Chesapeake, Virginia, after separating from his wife, because the Chesapeake school system paid better than what he had been making in Lynchburg. Earnest wanted to keep the lake house and allow Ms. Earnest to keep the home in Forest, which was paid for. Ms. Earnest had decided to move forward with finalizing the divorce, which would force a sale of the lake property, as, realistically speaking, Earnest could not buy her share. (*Id.* at 1394–1457.) Police also found writings by Mr. Earnest, detailing his financial difficulties and accusing Ms. Earnest of stealing their joint tax refund, hoarding her money while he paid the bills, and otherwise treating him unfairly.

The .357 handgun found with Ms. Earnest, from which the fatal shot was fired, was purchased by Mr. Earnest several years earlier; he told police that he bought the gun for his wife

---

[2] Uncontested evidence suggested that Earnest was having an affair with his girlfriend, Shameka, prior to the separation, which affair was apparently condoned by Ms. Earnest.

4

for her protection. However, the box for the gun was found in Mr. Earnest's girlfriend's home when police executed a search warrant there, and no ammunition for the gun was found in Ms. Earnest's home, save for the remaining bullets inside the gun. Her coworkers, friends, and family testified that they had never seen Ms. Earnest with a gun. No fingerprints were found on the gun. Two latent fingerprints were developed from the purported suicide note, however. Two different fingerprint analysts testified that the latent prints on the note belonged to Mr. Earnest, and no prints of Ms. Earnest were found on the note. A linguist who read over 150 items written by Ms. Earnest testified that the typed note did not have the writing style, punctuation, or tone of Ms. Earnest's writing. Further, the typewritten note was not on Ms. Earnest's computers and had not been printed from the printers in her home. (*Id.* at 2002–2172.)

Although Earnest told police that he had been in Chesapeake, Virginia, just over 200 miles from Ms. Earnest's home, investigation in Chesapeake raised more doubts for the police. Earnest's first landlord in Virginia Beach (for only a couple of months in 2005), Neil Phillips, said that Earnest made a statement one day following an argument with Phillips' wife, "Bitches like your wife and mine should be dead." (*Id.* at 1630.)

Earnest's workday ended at 4:00 p.m., and the drive from Chesapeake to Forest could be made easily in just over three and a half hours. One coworker interviewed by police, David Hall, indicated that Earnest borrowed his pickup truck the week of December 17, 2007, saying he was moving from his rental room to a campground. Hall's wife testified that Earnest brought the truck back on Thursday morning, December 20. Earnest apologized to Hall for a bleach stain on the driver's side floor mat, where Earnest had tried to clean up after using the truck. (*Id.* at 1874–91.) The campground manager testified that Earnest did not have a space rented at the campground until December 26, when Earnest's mother came in to make the arrangements. (*Id.*

at 1914–1920.)  In January, Earnest borrowed the truck again for a single afternoon.  When Earnest returned it, Hall thought the truck handled differently.  Hall testified that he later found a window placard from Kramer Tire in his glove box.  When he asked Earnest about the placard, Earnest said that he had gotten four new tires put on the truck because he had accidentally punctured two of the tires when he ran over some nails.  Hoping to get the two good tires back, Hall called the Kramer Tire near the high school, but the facility had no record of a truck with his license plate being there.  After calling around to other Kramer Tire locations, Hall found the truck's service ticket for new tires in January 2008 at the Virginia Beach store on Providence Road, much further away than the Chesapeake locations.  Hall also learned that service ticket for his truck was in the name of "Tom Dunbar."  (*Id.* at 1874–79.)

Rick Keuhne from Kramer Tire testified about the truck tires.  He remembered the incident because the tires on the truck were in good shape, had nothing wrong with them, and did not need to be replaced.  He told Mr. Dunbar that he did not need new tires, but the man insisted on getting new ones.  Keuhne identified the work order, which had the license plate number of Hall's truck, with the name Tom Dunbar, an address in Roanoke that turned out to be fictitious, and a phone number with a West Virginia area code (where Earnest's parents lived).  The tires were paid for with cash.  (*Id.* at 1921–67.)

Three of Mr. Earnest's former coworkers in Chesapeake testified that Earnest told them he was not married and had never been married; Earnest also claimed that he was independently wealthy to these three persons and to two others who testified.  (*Id.* at 1644–1688; 1899–1913.)  Significantly, the high school principal where Earnest worked testified that Earnest called her around 5:00 p.m. on December 21, 2007, and advised her that he was at his lawyer's office about to be questioned because his estranged wife had apparently committed suicide because of a failed

6

relationship; this was the principal's first knowledge that Earnest was married. (*Id.* at 1795.) This was also *before* the police ever provided Earnest information about the circumstances of Ms. Earnest's death or the apparent suicide note, a detail that had not been publicly released by the police. Finally, Jesse McCoy testified that he had made arrangements to pick up Earnest's car for detailing during the week of December 17; McCoy suggested December 19, but Earnest said he would be "on the road" that day, so they agreed for McCoy to pick the car up from the high school on the morning of December 20. Later, Earnest called McCoy and pushed the pick-up time from 8:00 a.m. to 9:15 a.m., in case he ran late getting back to Chesapeake. (*Id.* at 1818–38.)

Earnest's counsel vigorously cross-examined all prosecution witnesses and called expert witnesses and alibi witnesses on behalf of Earnest. After hearing all the evidence, the jury deliberated, resolving evidentiary conflicts in the government's favor, and returned a verdict of guilty on both charges. (Trial R. at 152–53.) The jury recommended a sentence of life in prison for first-degree murder and three years (mandatory) for use of a firearm in the commission of the murder. (*Id.* at 156–57.) The trial court ordered a pre-sentence report and held a sentencing hearing on January 25, 2011, after which the court imposed the sentence recommended by the jury. The court entered the final judgment on February 10, 2011. (*Id.* at 178–80.)

Earnest appealed his conviction to the Court of Appeals of Virginia, raising numerous issues:

- The trial court's failure to move the trial to a venue in a different judicial circuit;
- The trial court's failure to grant a mistrial and dismiss the entire venire panel upon learning that members of the venire had talked about the case before voir dire and jury selection;

- The trial court's exclusion of the following from evidence:
    - Evidence of "third-party guilt";
    - Telephone records of the victim to show that she had not had contact with Earnest;
    - Telephone records of Marcy Shepherd and a videotape of her police statement as circumstantial proof that Shepherd destroyed phone records relevant to the victim's activities at the time of her death;
    - Evidence about Maysa Munsey's arrest for identity fraud;
    - Testimony about how the victim's Blackberry could have been remotely reset from her work computer system;
    - Testimony of Jennifer Mnookin as an expert in fingerprint methodology to contradict certain testimony of the Commonwealth's fingerprint experts; and
    - Sur-rebuttal evidence from the defense;
- The trial court's admission of the following evidence:
    - Testimony about the Earnests' separation and divorce;
    - Mr. Earnest's financial condition during time periods two years before and two years after the victim's death;
    - Testimony that Earnest borrowed Hall's truck and replaced the tires;
    - Testimony of Johnson and Riding that a partial latent fingerprint can be identified as a match to a known individual;
    - Sergeant Neal's testimony about how long it took him to drive from Chesapeake, Virginia, to Forest, Virginia; and

8

- o A photograph of the cover of the victim's journal;
- The sufficiency of the evidence to support a conviction because the evidence failed to exclude "every theory of innocence"; and
- The trial court's failure to give a requested jury instruction about fingerprint evidence.

The Court of Appeals initially rejected the appeal on all issues in a per curiam opinion, but on petition for consideration by a three judge panel, agreed to consider the appeal only on whether the trial court erred in refusing to allow Dr. Mnookin[3] to testify as an expert witness in fingerprint methodology and refusing to allow her to contradict Johnson's testimony that no one had ever found two different people with the same fingerprint. After considering the issues, the Court of Appeals affirmed the trial court's judgment. *Earnest v. Commonwealth*, 734 S.E.2d 680 (Va. Ct. App. 2012).

Earnest then appealed to the Supreme Court of Virginia, raising several of the same errors, but the court denied his petition on July 13, 2013. (Addendum to Trial R. at 11.) The Supreme Court of Virginia denied Earnest's petition for rehearing on September 23, 2013. (*Id.* at 12.) Earnest filed a petition for certiorari in the United States Supreme Court, which the Court denied. *Earnest v. Virginia*, No. 13-799 (filed Feb. 24, 2014).

On September 4, 2014, Earnest filed his state petition for habeas corpus in the Amherst County Circuit Court. He raised three sets of claims: (1) due process violations, including several allegations of prosecutorial misconduct, plus denial of his right to put on a defense by excluding evidence of third-party guilt and denial of fair trial by changing venue to another

---

[3] Dr. Mnookin was a professor of law at UCLA, teaching evidence, and had written extensively about the lack of scientific foundation underlying fingerprint analysis testimony. However, she was not a fingerprint examiner and had never examined fingerprints herself.

9

location in the same judicial circuit; (2) ineffective assistance of counsel, including failure to investigate, failing to object to certain evidence, failing to offer a divorce document, and failing to argue that the victim committed suicide; and (3) evidentiary errors, consisting of most of the evidentiary issues raised in his direct appeal. (Habeas R. at 2–11.) The court issued a letter opinion denying the claim, without a hearing, on February 16, 2017. (*Id.* at 128–41.) The final order was entered on May 5, 2017. (*Id.* at 141–48.) On May 22, 2018, the Supreme Court of Virginia denied Earnest's appeal, finding no error. (*Id.* at 172.) The United States Supreme Court then denied his petition for certiorari. *Earnest v. Davis*, No. 18-5728 (filed Oct. 15, 2018).

Earnest certified the mailing of the current petition for relief under § 2254 on November 15, 2018, and the petition was received and docketed in the clerk's office on November 29, 2018. On August 7, 2019, Earnest mailed a motion for leave to file amended petition, along with his amended petition. The court granted leave to file the amended petition on August 19, 2019, without expressing any opinion on the merits of the additional allegations. (Dkt. No. 16.) In his amended petition, Earnest raises the following issues:

(1) The trial court erred in not allowing a complete defense using exonerating DNA evidence of blood and hair in the victim's home to create an alternative theory of third-party guilt;

(2) Ineffective assistance of counsel for failing to investigate witness reports of police misconduct;

(3) Commonwealth attorney withheld material, exculpatory evidence of prior statements of David and Vicky Hall, and ineffective assistance of appellate counsel for failing to raise the claim on appeal;

(4) The trial court erred in not allowing Dr. Jennifer Mnookin to testify as an expert in fingerprint methodology and to contradict the testimony of the Commonwealth's experts;

(5) The Commonwealth withheld (and destroyed) videotape evidence from Great Bridge High School, showing that Earnest worked until just after 4:00 p.m. on December 19, 2007, and Earnest became aware of this evidence being withheld by the Commonwealth in May 2019, rendering this new evidence of actual innocence; and

(6) Ineffective assistance of trial counsel in failing to investigate the existence and disappearance of the videotape.

## II. DISCUSSION

Under 28 U.S.C. § 2244(d)(1), a petitioner has one year in which to file a federal habeas corpus petition. The statute of limitations runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* Section 2242(d)(2) tolls the statute of limitations during the time in which "a properly filed application for State post-conviction or other collateral review . . . is pending." In addition to

this statutory tolling, the court may equitably toll the statute under some circumstances, including upon the introduction of new evidence that persuades the court that a reasonable juror probably would not have convicted the defendant, but for the constitutional errors alleged. *McQuiggin v. Perkins*, 569 U.S. 383, 393–95 (2013); *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

## A.  Statutory Time Calculation

The United States Supreme Court denied Earnest's petition for appeal on February 24, 2014, and that is the date on which the one-year statute of limitations began to run. Absent tolling, the last date for filing his federal habeas petition in this court was February 24, 2015. However, the "time during which" a properly filed state habeas proceeding was pending tolled the statute, or stopped the clock from running, when the state petition was filed. Earnest filed his state petition on September 4, 2014. At that time, 192 days of the statute had passed, and then the clock stopped. When the state action was no longer pending, the clock resumed at the point where it was when it stopped; the one-year period did not start over again. *Harris v. Hutchinson*, 209 F.3d 325, 327 (4th Cir. 2000).

Under § 2244(d)(1)(A), a judgment of conviction becomes final at "the conclusion of direct review or the expiration of the time for seeking such review." The Supreme Court has interpreted direct review of a conviction to include review by the Court. *Clay v. United States*, 537 U.S. 522, 527–28 (2003). However, the Court expressly declined to interpret § 2244(d)(2) the same way, because that section is worded differently and refers to a different type of litigation. State post-conviction review ends when the state courts have resolved the issue; "after the State's highest court has issued its mandate or denied review, no other state avenues for relief remain open." *Lawrence v. Florida*, 549 U.S. 327, 332 (2007). After the State's highest court has dispensed with the matter, state post-conviction relief is no longer "pending." *Id.* Therefore,

Earnest's state post-conviction relief ended on May 22, 2018, when the Supreme Court of Virginia denied his state habeas appeal. The statute of limitations was not tolled during the pendency of Earnest's petition for certiorari in the state habeas case. Accordingly, the clock resumed on May 22, 2018, with 173 days remaining. Earnest's 173 days ended on November 11, 2018, which was a Sunday, and Monday, November 12, 2018, was a federal holiday, making Earnest's petition due on November 13, 2018. According to his certificate of service, Earnest mailed the petition on November 15, 2018, two days after it was due, rendering the petition untimely under the statute.

## B. Equitable Tolling

The statute of limitations for habeas petitions is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 636 (2010). To receive the benefit of equitable tolling, however, a petitioner must show (1) that he has been pursuing his rights diligently and that (2) some extraordinary circumstances prevented his timely filing. *Id.* at 649. The length of the delay does not guide the determination; the court considers only the reasons for delay in determining whether equitable tolling is appropriate. *Rouse v. Lee*, 339 F.3d 238, 253 (4th Cir. 2003).

Earnest has failed to show that *extraordinary circumstances* prevented the timely filing of his petition. His stated reasons for untimely filing are (1) that he thought he had to wait until the Supreme Court considered his petition for certiorari before he could file, unless he received a waiver or permission to file sooner, and (2) lack of access to the law library during prison lockdowns lasting 15 days during the 31 days prior to the due date and another nine days in August and September. Neither reason qualifies as an extraordinary circumstance.

Mistaken calculation of the filing deadline, whether by counsel or by a *pro se* litigant, is not generally an extraordinary circumstance entitling a petitioner to equitable tolling. *Holland*,

13

560 U.S. at 651. Neither is ignorance of the law, "even in the case of an unrepresented prisoner." *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004). Earnest's failure to realize that the time his petition for certiorari to the Supreme Court was pending did not toll the statute of limitations is simply ignorance of the law, law that has been firmly established by the Supreme Court since 2007. To the extent he thought he needed a waiver to file his petition while the matter was still pending before the Supreme Court, Earnest never filed a request for such waiver or permission to file his petition in this court and stay the proceedings pending the outcome of his certiorari petition.

Limited access to the law library has not generally been considered an extraordinary circumstance, either. *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000) ("Even in the case of an unrepresented prisoner alleging a lack of legal knowledge or legal resources, equitable tolling has not been warranted."); *Atkins v. United States*, 204 F.3d 1086, 1089 (11th Cir. 2000) (rejecting a claim of equitable tolling when petitioner alleged that two prison lockdowns prevented him from using the library for a six month period); *Ramirez v. Yates*, 571 F.3d 993, 998 (9th Cir. 2009) (holding that normal restrictions on law library access, including during stays in administrative segregation, are not "extraordinary" for purposes of equitable tolling). Even if one were to consider such limited access extraordinary, Earnest cannot show that limited access prevented him from filing his petition in a timely manner. As noted by the Tenth Circuit Court of Appeals in *Marsh v. Soares*, the claims petitioner asserted were the same as those already presented in his state habeas case. *Marsh*, 223 F.3d 1217, 1221 (10th Cir. 2000). Likewise, Earnest has necessarily raised the same claims (for exhaustion purposes) either in his state appeal, in his state habeas, or both, making additional access to the law library less essential to

14

filing the same arguments before this court. *See also Hizbullahankhamon v. Walker,* 255 F.3d 65, 76 (2d Cir. 2001).

For these reasons, Earnest has failed to show circumstances entitling him to equitable tolling of the statute of limitations.

## C. Actual Innocence

The Court has recognized a miscarriage-of-justice exception in an effort to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup*, 513 U.S. at 324. A credible claim of actual innocence must be supported by new reliable evidence. *Id.*

> Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.

*Id.* at 316. The video upon which Earnest bases his actual innocence claim is not new. He and his counsel were aware that Great Bridge High School had a security system that recorded random video images throughout the school. Indeed, as Earnest states in his amended petition, the government produced in discovery a transcript of conversation between the school principal, the prosecuting attorney and Investigator Mayhew, which occurred at the high school on January 22, 2008, in which the principal advised that the video system recorded over itself after 30 days, and thus video of December 19 and December 20, 2007, was no longer available. Evidence that is known, but only newly available, does not constitute newly discovered evidence and cannot toll the habeas statute of limitations. *Sistrunk v. Rozum*, 674 F.3d 181, 189 (3d Cir. 2012). *See also Johnson v. Medina*, 547 F. App'x. 880, 885 (10th Cir. 2013).

Earnest does not have a video recording to offer even now, so one cannot say that the video is available, either. He alleges that the police received a copy of the video recording from

15

school officials and then destroyed it. He bases this allegation on statements purportedly made to a representative of the Hamilton Firm, PLC, in May 2019 by Bob Berry, counsel for the Chesapeake City School Board. Earnest asserts that Berry told the Hamilton Firm that the school superintendent preserved the video and made it available to the Bedford County law enforcement officers in December 2007. (Mot. to Am./Am. Pet. at 7, Dkt. No. 15.) Earnest has provided neither an affidavit nor anything in writing from the Hamilton Firm or from Bob Berry to support his claim, but he immediately jumps to the conclusion that the government received the video and then destroyed it.

The prosecutor on the case, Wesley Nance, and the lead investigator during December 2007, Gary Babb, each filed an affidavit indicating that he had neither requested nor received any video surveillance footage of Great Bridge High School from anyone. (Aff. of Nance, Ex. N to Br. in Supp. of Second Mot. to Dismiss, Dkt. No. 20-1; Aff. of Babb, Ex. O to Br. in Supp. of Second Mot. to Dismiss, Dkt. No. 20-2.) Whether agents of the Commonwealth ever possessed this evidence in the form now alleged by Earnest is clearly disputed.

Having never seen the video, Earnest can only speculate on its contents, including whether the random images collected included images of him around 4:00 p.m. on December 19, 2007. Assuming that the video existed and showed Earnest leaving the high school shortly after 4:00 p.m., as he initially told investigators and as he testified at trial (Trial Tr. at 2540), the video merely corroborates uncontradicted testimony given at trial by Earnest and by defense witness Al Ragas. (*Id.* at 2296–2397.) The prosecutor never disputed that Earnest left the high school around 4:00 p.m. Rather, the state's theory of the case was that Earnest had time to drive to Forest, Virginia, and commit the murder after he left the school. (*Id.* at 2782–84.) For this reason, even if the video were found and were considered new evidence, Earnest could not

establish the second part of the actual innocence/miscarriage of justice exception: Earnest has not established that, in light of the new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327. In determining whether, in light of the new evidence, no reasonable juror would find the defendant guilty, the federal habeas court must consider all evidence, old and new, admissible and excluded, "to make a probabilistic determination about what reasonable. . . jurors would do." *Id.* at 328–29. The jury already knew that Earnest did not get off work until 4:00 p.m. There is no reason to conclude that the video, if it exists, would show anything else. The evidence is ample to support reasonable jurors in concluding that Earnest had time to travel to Forest and commit the murder after he left work. Earnest has failed to establish "actual innocence" as grounds for considering his untimely claims.

### III. CONCLUSION

For the reasons stated, the court will grant the respondent's motion to dismiss. Further, concluding that Graham has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(1), a certificate of appealability will be denied.

An appropriate order will be entered.

Entered: September 30, 2020.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge